# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

TORRENCE SHEPPARD and DEVONTRAY MYERS,

    Plaintiffs,

    v.

CITY OF BLACKSHEAR, GA., BOYETTE ELECTRIC, INC., CARL I. BOYETTE, LARRY T. ETHERIDGE, KEVIN BRITT, MATT GOURLEY, CHRIS CARTER, and CHRIS WRIGHT, in their individual capacities,

    Defendants.

CV 512-136

## ORDER

Plaintiffs Torrence Sheppard and Devontray Myers claim police officers and a private citizen brutalized them when they were arrested during the commission of a theft. Plaintiffs bring excessive force claims under 42 U.S.C. § 1983 against several of the officers, including Ware County Search Team members Kevin Britt and Matt Gourley in their individual capacities. Other officer-Defendants include Blackshear Police Department Chief of Police Lawrence T. Etheridge, Chief Detective Chris Wright, and Detective Chris Carter, in their individual capacities, along

AO 72A
(Rev. 8/82)

with their municipality, the City of Blackshear, Georgia. Finally, Plaintiffs also bring excessive force claims against a private citizen, Carl Boyette, and the company he owns, Boyette Electric, Inc. All Defendants have filed motions for summary judgment. See Dkt. nos. 35-1; 37-1; 39-1.

Plaintiffs have conceded that Defendants City of Blackshear, Etheridge, Carter, and Boyette Electric are entitled to summary judgment, and those Defendants' motions are **GRANTED**. However, because issues of material fact remain as to Defendants Britt, Gourley, Wright, and Boyette's § 1983 liability, their motions for summary judgment are **DENIED**.

## ALLEGED FACTS

While many of the following facts are contested, the Court considers the record in a light most favorable to the Plaintiffs for summary judgment purposes. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

Plaintiffs Torrence Sheppard and Devontray Myers are stepfather and stepson, respectively. Dkt. no. 35-7 ("Myers Dep."), 8:17-19. On three occasions between November 16 and November 20, 2010, the two men set out to steal copper wire from Defendant Boyette Electric, Inc. Id. at 31:11-23; Dkt. no. 35-6 ("Sheppard Dep."), 32:11-18. The third theft occurred on November 20, 2010, and that night Plaintiffs and a third party

drove to Boyette Electric's property.[1] Myers Dep. 36:10-20.

Plaintiffs and the third party left their truck parked on a dirt road behind Boyette Electric and walked through a wooded area before reaching a fence surrounding the property. Id. at 41:5-42:1; Sheppard Dep. 38:6-16, 39:12-17.

Before they could enter the facility to steal copper wire, an alarm at the fence was triggered and Plaintiffs retreated back through the woods towards the truck. Myers Dep. 42:12-43:4; Sheppard Dep. 40:20-22. However, before reaching the truck, Plaintiffs noticed approaching police lights. They lay down in the woods, about 20 yards from one another, hoping to avoid detection. Myers Dep. 44:17-45:1, 46:10-12; Sheppard Dep. 43:9-44:6.[2]

After the alarm was triggered, the alarm company contacted Defendant Carl Boyette, owner of Boyette Electric, and the police to notify them of a possible break-in. Dkt. no. 43-3 ("Boyette Dep."), 13:19-14:16. Boyette and law enforcement officers from the Blackshear Police Department and Pierce County Sheriff's Office went to the scene of the break-in, and the officers formed a perimeter around the wooded area where Plaintiffs were hiding. Sheppard Dep. 46:6-17. Defendant Chris

---

[1] This third party, while present during the underlying events, is not a party to this case.
[2] While Myers says that Plaintiffs never made it to the truck before lying down to hide, Sheppard deposed that the trio was already in the truck before they saw the lights, jumped out of the truck, and ran back into the woods. This discrepancy is not relevant to the summary judgment analysis, and either version of this episode, taken as true, would yield the same result.

Wright, Chief Detective for the City of Blackshear Police Department, headed the investigation that led to Plaintiffs' arrests. Dkt. no. 43-5 ("Wright Dep."), 66:13-17.

Wright enlisted the help of the Ware County Search Team and their tracking dog in searching for the Plaintiffs. Id. at 32:2-34:24. This two-man team consisted of Defendants Matt Gourley and Kevin Britt. Id. at 34:22-24; Dkt. no. 43-7 ("Britt Dep."), 7:17-25. Wright called Britt to assist with the search because law enforcement agencies will frequently share searching "assets," such as canine tracking teams, amongst themselves. Id. at 33:15-22. Britt recalls that he was asleep at home when he was called to help with the search for Plaintiffs, while Gourley says he was not yet in bed when Britt called to tell him about the search. Britt Dep. 13:5-7; Gourley Dep. 10:25-11:6. Both Britt and Gourley claim that they were the only individuals who entered the woods to apprehend Plaintiffs. Britt Dep. 46:1-6; Gourley Dep. 14:16-15:12.

Britt and Gourley found Sheppard first. Britt Dep. 17:11-14. For their part, Britt and Gourley claim that Britt placed Sheppard under arrest by placing his knee in Sheppard's back and then handcuffing him before lifting him up off of the ground. Id. at 28:3-11. Britt says that he asked Sheppard who else was in the woods and that he was the only one to touch Sheppard while they were in the woods. Id. at 24:10-23; 23:6-18. Britt

then escorted Sheppard out of the woods, where he and other officers led Sheppard to a vehicle. Id. at 19:25-20:24.

Plaintiff Sheppard tells a different version of his encounter with the Ware County Search Team. He says the Ware County Search Team found him after the search dog came up to him and licked his face. Sheppard Dep. 53:7-9. While stating that he does not know for sure, he estimates that the search party that apprehended him included five or six men. Id. at 51:13-19. After he was placed in handcuffs, Sheppard says a "big, big fella with a striped shirt" kicked him in the face. Id. at 53:25-54:6. One of the men who arrested him said "Well, you mean to tell me they woke me out of my bed to come search for your nigger ass?" before kicking him in the face. Sheppard Dep. at 50:1-3. The same person repeatedly kicked him in the head several times while he was on the ground. Sheppard Dep. 53:19-21. The man kicking Sheppard asked him "Who else is out here?", and when Sheppard said "Nobody", the man said, "You lying motherfucker," and continued kicking him in the head until he was "out of it" and no longer responding to questions. Id. at 54:19-55:2.

Sheppard cannot specifically identify who it was that kicked him in the face, but he says it was a "heavyset, kind of tall guy with a striped shirt" who appeared to be leading the search team. Id. at 58:14-24. When asked later in his deposition to provide a height and weight estimate, Sheppard estimated that

AO 72A
(Rev. 8/82)

this individual weighed 260 pounds and was "kind of" the same height as a man present at the deposition who stated for the record that he was six feet, two inches tall. Id. at 89:16-24. Also, when asked what color the stripes were on the assailant's shirt, Sheppard said they "might have been blue and white stripes." Id. at 89:8-12.

Myers watched from his hiding spot as his stepfather was beaten. While he could not see specific details in the darkness, he says he heard the search team—Myers estimates four to five people—beating his stepfather and asking him "Who else is in the woods with you," and his stepfather responding "Nobody. Nobody. Nobody else is in the woods with us." Myers Dep. 49:13-24; 50:11-12. Myers says "you could tell they had him in handcuffs, and when they was hitting on him they were just repeatedly steadily hitting on him trying to get him to tell them who else was out there in the woods." Id. at 50:19-23. All the while, Myers heard Sheppard yelling "Why are y'all beating me?" Id. at 51:4-6.

After the beating, the assailants picked Sheppard up by his handcuffs and pant legs, "like a suitcase," and carried him out of the woods to Wright's van. Id. at 50:6-8; 55:10-17. Sheppard says that when he first came out of the woods, Wright saw that he was injured and that his face was bleeding and "deformed." Id. at 63:21-64:3. When Sheppard and Wright were standing in

AO 72A
(Rev. 8/82)

front of the van, Boyette approached Sheppard while he was being held by Wright. Id. at 56:23-25. Wright asked Boyette, "Is this the one?", and Boyette said "Hold up his shoes." Id. at 57:2-25. Boyette inspected Sheppard's shoes and said Sheppard was not "the one." Id. Boyette then said to Sheppard, "You are lucky you weren't out here last night, because I was waiting on you to blow your motherfucking head off." Id. Then, while Wright was, according to Sheppard, intentionally holding Sheppard so that he could not move, Boyette hit Sheppard in the face with his flashlight. Id. Sheppard asked Wright, "Man, why are y'all beating me like that?" To which Wright replied, "I didn't do it. Ware County State Search Team did it to you." Id. At this point, Sheppard was "bleeding all over" Wright's vehicle and blood was coming out of his nose and mouth from the beating earlier in the woods. Id. at 63:21-64:23. Wright recalls that Sheppard complained of Britt and Gourley "roughing them up" in the woods the night he was arrested. Wright Dep. 50:6-11.

Soon after Sheppard was taken out of the woods, the search team returned and located Myers. As with Sheppard, Britt and Gourley claim they were the only two individuals with Myers when he was apprehended. Britt Dep. 29:14-33:15. Myers did not resist arrest. Britt Dep. 29:20-22.

The search dog first found Myers and then alerted his presence to the search team. Myers Dep. 53:1-15. Myers estimates

three or four people came to arrest him, although he cannot say for sure because he was face down on his stomach when they found him. Id. at 52:3-5; 53:18-20. When Myers realized he had been located, he says he "just was hoping that they weren't going to beat [him] like they beat [his] stepdaddy." Myers Dep. 53:21-54:2. However, as soon as he was handcuffed, Myers says "they just went to beating me off the top, [and] started calling me racial slurs." Id. at 54:4-7. The beating lasted approximately two or three minutes, and his attackers hit him with their fists on his face, his nose, and the back of his head. Id. at 56:4-11. At one point, Myers temporarily lost consciousness. Id. at 56:13-16.

While they were beating him, Myers says his assailants pulled the hoodie he was wearing and wrapped it around his head so he could not see what was going on around him. However, Myers was able to catch a glimpse through his hoodie of his attacker and noticed that this man was wearing a red collared shirt. Id. at 110:14-16. Also, Myers says that he could hear one distinct voice that he will recognize for the rest of his life, and he states that he has "to live with every day, hearing the same voice in [his] head over and over." Id. at 98:1-4. That voice was saying "Are you going to steal from us? We are going to teach you about stealing from us." Id. at 52:3-15. Myers says "[t]hey just kept repeatedly hitting me and grabbed my hoodie

and put it around my head while they were chocking [sic] me and beating me." Id. All he said he could see were red, black, and white collared shirts. Id.

Myers was then walked out of the woods. Once in the opening, he saw Boyette, who appeared to be waiting for him. Id. at 110:8-10. Myers initially noticed that Boyette was wearing a red collared shirt. Id. at 58:15-20. Myers asked Boyette "Why did y'all beat us? Why did the police beat us?" Boyette told him, "Well, you are lucky I didn't catch you on my place last night because I would have blew your brains out." Id. at 58:21-25. Upon seeing Boyette in the red collared shirt and hearing his voice again, Myers says he is about 75 percent sure that the person beating him in the woods was Boyette. Id. at 109:21-110:16. Myers recalled, "the dude in the red collar stripe shirt was a civilian. I can't exactly say that was Carl Boyette's shirt, but he was the only person in the woods with the red collared shirt on, you know, and a voice that sounded the same." Id. at 112:13-18. After Myers was brought out of the woods, he was placed in a police car with his stepfather. Id. at 66:2-3. Myers says he was bleeding from his nose and cuts on his face as the car transported them to the Pierce County Police Department. Id. at 66:22-67:7.

Later, when asked if he ever spoke to Wright about the beatings, Myers said that he had asked Wright "Why did they beat

AO 72A
(Rev. 8/82)

me?", but Wright "didn't have anything to say about it." Id. at 111:12-13. Then, in his own words, Myers summed up his and his stepfather's grievances:

> I feel like why—if they did have another person out there beating me, and y'all are supposed to be so-called police officers, then that shouldn't take place out there. Y'all should have stopped that before it even happened, you know, or shouldn't have no other civilians out there in the woods with us while y'all are out there doing y'all's job. That is not his job. That's y'all's job to find us. That is why I feel like, you know, they was in the wrong. . . . They did not do their job like they were supposed to.

Id. at 111:15-112:4.

## PROCEDURAL BACKGROUND

At a motions hearing on November 14, 2014, Plaintiffs conceded that summary judgment should be granted as to several Defendants, including Defendants Etheridge, City of Blackshear, Georgia, Boyette Electric, Inc., and Carter. The Court **GRANTS** summary judgment as to these Defendants.

Thus, Plaintiffs only contest the motions for summary judgment filed on behalf of Defendants Britt, Gourley, Wright, and Boyette. The Court will consider each of these motions in turn.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). However, where the nonmovant's own sworn testimony contradicts the more favorable testimony of another witness, the court must accept the nonmovant's version of the events. Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

11

## I.  Excessive Force Claims Against the Law Enforcement Officers

Plaintiffs bring excessive force claims against Officers Britt and Gourley under two theories: (a) excessive force, and (b) failure to intervene when excessive force was used in their presence. They also bring an excessive force claim against Wright. The three officers assert the qualified immunity defense.

### a. Section 1983 Qualified Immunity and Excessive Force

Qualified immunity "offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Bashir v. Rockdale Cnty., 445 F.3d 1323, 1327 (11th Cir. 2006) (quotations omitted). The defense protects "all but the plainly incompetent or one who is knowingly violating the federal law." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

To overcome a defendant's privilege of qualified immunity, a plaintiff must show "(1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)). Courts need

not analyze these prongs in that sequential order, but may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). In analyzing qualified immunity questions at summary judgment, courts must approach the facts as they would for any other issue on summary judgment—that is, in a light most favorable to the nonmovant. See Tolan v. Cotton, 134 S. Ct. 186, 1865-66 (2014).

Where an excessive force claim arises in the context of an arrest of a free citizen, that claim invokes the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." Graham v. Connor, 490 U.S. 386, 394 (1989). Whether a constitutional violation arises from the use of force during an arrest is determined by the Fourth Amendment's "objective reasonableness" standard. Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). In applying this standard, courts may consider "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." Id. (quoting Slicker v. Jackson, 215 F.3d 1225, 1233) (11th Cir. 2000)).

AO 72A
(Rev. 8/82)

The Eleventh Circuit has concluded that its decisions regarding the use of excessive force "establish that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." Fils v. City of Aventura, 647 F.3d 1272, 1289 (11th Cir. 2011). For example, in Hadley, two officers were present when the plaintiff was arrested. Id. at 1330. The district court found that one officer punched the plaintiff in the stomach while he was handcuffed and not struggling or resisting arrest. Id. The Court of Appeals affirmed the district court's denial of qualified immunity for this officer because his "single punch constituted excessive force" under these circumstances. Id.

However, while a single punch alone is enough to establish the unconstitutional use of excessive force in some circumstances, it may not be enough to establish that other officers present during the assault failed to intervene. For example, the court in Hadley also held that the second officer, who was present when the first officer delivered the single blow to the plaintiff's stomach, did not commit a constitutional violation. Id. While noting that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force . . . can be held liable for his nonfeasance," the court held that "it must

AO 72A
(Rev. 8/82)

also be true that the non-intervening officer was in a position to intervene yet failed to do so." Id. (quoting Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007); Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000)). Because the district court did not find that the second officer could have prevented the first from punching the plaintiff, the Court of Appeals held that it erred in denying the second officer qualified immunity. Id.; cf. Priester, 208 F.3d at 925 (denying qualified immunity where an officer failed to intervene when he watched a police dog attack plaintiff for two minutes without attempting to restrain the dog).

In the Eleventh Circuit, for the law to be "clearly established" such that a plaintiff can overcome the qualified immunity defense, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (quotations omitted). However, where there are no Fourth Amendment cases on point showing that a particular course of police conduct is clearly unconstitutional, the plaintiff must show that the defendant's "conduct was so far beyond the hazy border between excessive and acceptable force that [the defendant] had to know he was violating the Constitution even

without caselaw on point." <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir. 1997).

### b. Defendants Kevin Britt and Matt Gourley

Plaintiffs have alleged that Britt and Gourley used excessive force in arresting them either by unnecessarily assaulting them after they were in handcuffs and not resisting arrest, or by failing to intervene when another officer or citizen was assaulting them.

There is ample evidence in the record from which a jury could find that both Britt and Gourley used excessive force either by attacking the Plaintiffs or by failing to intervene. Sheppard says he was handcuffed and did not resist arrest before his attacker complained about having to get out of bed to search for him and kicked him in the head several times. He also testified that the man kicking him appeared to be the leader of the search team. These allegations, along with Britt's admission that he was already in bed when he was summoned to lead the search, would support a jury's finding that Britt was the officer who used excessive force against Sheppard as he lay handcuffed on the ground, not resisting arrest.

Furthermore, regardless of how many officers were present in the woods when Sheppard and Myers were attacked, Britt and Gourley both admit that they were immediately present in the woods when each Plaintiff was apprehended. Sheppard says he was

kicked several times in the head, and Myers says his attack continued for two or three minutes. Under these circumstances, any officer who was present during the attacks would have had time and opportunity to intervene. Because Britt and Gourley both claim they were present during the entirety of both Plaintiffs' arrests, each officer could be said to have failed to intervene to the extent that he did not actively participate in the beatings.

Britt and Gourley argue that, despite their own testimony that they were the only two people in the woods when Plaintiffs were apprehended, the Court must credit Plaintiffs' testimonies that multiple other individuals were in the woods as well when considering the facts for summary judgment purposes. See Dkt. no. 57. While Britt and Gourley are correct that the Court must credit Plaintiffs' versions of the events when they contradict other witnesses' testimonies, see Evans, 407 F.3d at 1278, Plaintiffs' versions, taken as true, do not require summary adjudication for these two Defendants. As discussed above, Sheppard offered several salient details in his testimony suggesting that Britt was the officer who attacked him. Furthermore, even assuming multiple other persons were in the woods with Defendants when they apprehended Plaintiffs, nothing in Plaintiffs' testimonies contradicts Defendants' testimonies that they were immediately present from the time Plaintiffs were

AO 72A
(Rev. 8/82)

arrested to the time they exited the woods. Thus, if the evidence available upon summary judgment consideration does not show that either of these Defendants assaulted Plaintiffs, it still shows that they failed to intervene during the allegedly prolonged beatings in the woods.

Britt and Gourley also argue that Plaintiffs' complicated identifications of their attackers require summary judgment. In his deposition, Sheppard said the man kicking him was a "big," "heavyset," and "tall" man, weighing "approximately" 260 pounds, and about as tall as a man present in the deposition room who claimed to be six feet two inches tall. Sheppard also said his attacker may have been wearing a blue and white striped shirt. For his part, Myers says he was attacked by someone who said: "Are you going to steal *from us*?", whom he later identified as Boyette.

Defendants argue that Britt is five feet eleven inches tall, weighing 190 pounds, and Gourley is five feet nine inches tall, weighing 185 pounds. Dkt. no. 39-5, ¶¶ 3-4. Also, they claim to have worn camouflage during the search, and not striped shirts. Id. at ¶ 5. Finally, they claim that Myers's version of the events can only be interpreted to mean that his victim, Boyette, attacked him, and not the arresting officers.

These facts, though, even if uncontroverted and taken as true, do not require summary judgment in this case. Sheppard

AO 72A
(Rev. 8/82)

never stated that the identifying characteristics he offered were precise, but rather said they were approximations. And again, *nothing* about Plaintiffs' versions of the events contradicts these Defendants' own testimonies that they were consistently present with the Plaintiffs from the moment they were arrested to the moment they left the woods. Even if Britt and Gourley never touched either Plaintiff, all of the evidence shows that they were present in the woods when the beatings occurred, and they can thus be found to have failed to intervene in the use of excessive force.

It is clearly established in the Eleventh Circuit that both of the actions discussed above—use of excessive force and failure to intervene—violate the Constitution in these circumstances. The Eleventh Circuit has long held that a handcuffed, non-resisting defendant has a right to be free from excessive force. See, e.g., Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002) (denying qualified immunity to defendant who slammed plaintiff's head into the back of a police car after she "was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed."); Slicker, 215 F.3d at 1227 (denying qualified immunity to defendant who slammed plaintiff's head into pavement and kicked him in the leg, head, and back after he was handcuffed and fully secured); Priester, 208 F.3d at 926-27

(denying qualified immunity to officer who allowed police dog to attack arrestee who was subdued on the ground for two to three minutes); Smith, 127 F.3d at 1418-1420 (11th Cir. 1997) (denying qualified immunity to officer who broke arm of individual who "docilely submitted" to officer's request to "get down").

Similarly, it is well-established in the Eleventh Circuit that "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) (abrogation on other grounds recognized by Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000)); see also Baily v. City of Miami Beach, 476 F. App'x 193, 196-97 (11th Cir. 2012) (no qualified immunity for officer who watched for two or three minutes while two of his fellow officers "attacked" plaintiff); Priester, 208 F.3d at 927-28 (noting that a police officer's duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994, as determined in Byrd, 783 F.2d 1002).

Thus, the evidence considered in a light most favorable to the Plaintiffs could support a jury's finding that Defendants Britt and Gourley used excessive force against Plaintiffs, either by directly assaulting them or failing to intervene in

the assault. The law on excessive force and intervention is clearly established in these circumstances, and Defendants are not entitled to judgment as a matter of law based on qualified immunity. Defendants Britt and Gourley's motion for summary judgment (Dkt. no. 39-1) is **DENIED**.

### c. Defendant Chris Wright

Plaintiff Sheppard brings two theories of excessive force against Defendant Wright. First, Sheppard claims that Wright failed to intervene in the beating that took place in the woods. Second, Sheppard claims that Wright either actively participated in the use of excessive force against him when Boyette struck him in the face with a flashlight or, alternatively, failed to intervene in that assault.

### i. Wright's Failure to Intervene in the Assault in the Woods

Sheppard alleges that Wright, while he was outside of the wooded area, knew of the beating that was taking place in the woods, but failed to intervene. When Sheppard was escorted out of the woods, he says Wright saw that he was bleeding from his face and that his face was "deformed." Sheppard argues that because he asked Wright why he let the officers beat him and Wright responded "I didn't do that, Ware State Prison team did that," "[t]he inference is that Chris Wright knew what had happened." Dkt. no. 56, p. 20.

AO 72A
(Rev. 8/82)

The evidence of Wright's contemporary knowledge of the assault taking place in the woods is too speculative to create an issue of fact as to his willful failure to intervene in that assault. Wright's alleged statement that "the Ware County Search Team" assaulted Sheppard came after Wright saw Sheppard escorted out of the woods bloodied and beaten, by Sheppard's own account. Furthermore, Sheppard's own reply brief to Wright's motion for summary judgment argues that his knowledge of the assault came after Plaintiff left the woods, upon answering Sheppard's questions about the assault. Plaintiff argues that

> Defendant Wright was very aware of the beating
> Plaintiff received in the [w]oods *as soon as Plaintiff*
> *was brought out of the woods*. Plaintiff Sheppard asked
> him about the beating and was given a direct answer:
> "I didn't do it. Ware County State Search Team did it
> to you." . . . Defendant Wright recalls Plaintiff
> Sheppard complaining about being roughed up in the
> woods.

Dkt. no. 41-2, p. 5 (citations to the record omitted) (emphasis added). Sheppard later tries to recharacterize this evidence as proof that "Chris Wright at least knew about the beating of Plaintiff Sheppard in the woods contemporaneously with the beating," Id. at p. 6, but Plaintiff has pointed to no evidence in the record suggesting that Wright knew of the beating as it was occurring rather than after it had already ended. If Wright did not know of the beating in the woods as it was happening,

then he would not have been in a position to intervene.[3] Thus, there is not sufficient evidence in the record to support a finding that Wright committed a constitutional violation by failing to intervene in Sheppard's assault in the woods.

### ii. **Wright's Liability for the Boyette Incident**

Sheppard also contends that Wright participated in the use of excessive force when Boyette allegedly struck Sheppard in the face with a flashlight.[4] Specifically, Sheppard alleges that after Wright asked Boyette to inspect Sheppard's shoes, Boyette said:

> "You are lucky you weren't out here last night, because I was waiting on you to blow you motherfucking head off." . . . Then he hit me with the flashlight, pow. I was like, damn, Chris [Wright], you are sitting up here letting this [stuff] happen. I am saying that in my mind first. I asked Chris, "Man, why are y'all beating me like that?" He said, "I didn't do it. Ware County State Search Team did it to you." Chris was there when Boyette hit me in my face. He was standing right there and was holding me, kind of holding me together so I won't move or something. It seemed like he let him do that, you know what I am saying? He could have said hold it, wait a minute. We got him now so let's detain him and put him in the car and go to the county, whatever. They didn't do none of that. They stood there and harassed me and did what they did and that's when they took me to the county.

---

[3] That is not to say that Wright would have been in a position to intervene as a matter of law had he known contemporaneously of the assault taking place in the woods. That determination would depend on further analysis of the circumstances, such as his physical proximity to the assault and the extent to which he knew the assault was unconstitutionally excessive. However, the Court need not consider these questions having already determined that the evidence in the record would not support a finding that he even knew an assault was happening.

[4] Plaintiff Shepard has disclaimed any potential allegation that Wright is liable for failing to intervene when Boyette struck him with the flashlight. Dkt. no. 60, p. 17.

Sheppard Dep. 57:2-25. Sheppard also alleged that Wright saw him walk out of the woods with visible injuries.

If Sheppard is correct that Wright intentionally held him so that Boyette could strike him in the face with a flashlight, this would certainly be an unconstitutional use of excessive force under the Fourth Amendment's four-factor "objective reasonableness" test enumerated in Hadley, 526 F.3d at 1329. First, there would be no need for the use of force from any party—private citizen or police officer—against a compliant, non-resisting, handcuffed arrestee. Second, while a *de minimis* amount of force may be necessary to handle or escort a handcuffed suspect away from a crime scene, holding the suspect still so that someone else can strike him in the face with a flashlight is plainly excessive under the circumstances. Third, the extent of the injury is substantial—while Sheppard may not be able to prove that the blow to the face caused injuries distinguishable from those he incurred during the beating in the woods, the pain and indignity of such a strike alone would be an unjustifiable injury. Finally, the circumstances, as told by Sheppard, plainly show that the force was not applied in good faith, but was rather applied "maliciously and sadistically." See id.

Additionally, assuming Wright actively participated in Boyette's assault on Sheppard, it is clear that such conduct violates the Constitution. Parties have not cited any cases discussing an officer's alleged use of excessive force specifically by facilitating a private citizen's assault on a detained suspect, and this Court is aware of none. However, as stated above, in the Eleventh Circuit it is well-established that a handcuffed, non-resisting arrestee has a right to be free from excessive force from police officers. See discussion *supra*. On the spectrum of constitutional police conduct, facilitating a citizen assault on a handcuffed suspect is undoubtedly further beyond the "hazy border between excessive and acceptable force" than even a direct police assault on a suspect, such that the officer "had to know he was violating the Constitution even without caselaw on point." See Smith, 127 F.3d at 1419.

However, if Wright did not intend to facilitate Boyette's assault, then there would have been no constitutional violation on his part. The question, then, is whether the record available on summary judgment raises a factual question as to Wright's intent to participate in the Boyette assault. Under the Supreme Court's and Eleventh Circuit's dictates for weighing evidence upon summary judgment, this Court finds that there is a factual question.

AO 72A
(Rev. 8/82)

The Supreme Court in Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), instructs that the party moving for summary judgment "has the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Id. at 157. In Adickes, a central issue was whether a police officer and restaurant workers had conspired to refuse to serve food to the plaintiff and later have her arrested on a trumped-up vagrancy charge because she, a white woman, was dining with African-Americans. Id. at 148-49. The Supreme Court held that the defendants, on summary judgment, failed to show an absence of material fact by failing to foreclose the possibility that a police officer was present in the restaurant when Adickes ordered, and was refused, her food. Id. If the arresting officer had been in the restaurant, the Court held, a jury could infer from the circumstances that the officer had disapproved of Adickes dining with African-Americans and had somehow communicated his disapproval to the restaurant workers, thus influencing the decision not to serve Adickes her food. Id.

Here, the evidence viewed in a light most favorable to Sheppard is that Wright knew Sheppard had been assaulted in the woods and responded to this information indifferently; that he either summoned or allowed the victim of a crime, Boyette, to approach the suspect, Sheppard, at the crime scene in order to

26

inspect his person and identify him; and that he was present when Boyette verbally threatened Sheppard's life before striking him in the face. All the while, Wright was physically detaining Sheppard. Plaintiff does not have any direct evidence of Wright's intent to facilitate Boyette's assault, but a jury could infer, from the circumstantial evidence, that Wright intended to let Boyette strike Sheppard. Similarly, in Adickes, Adickes did not have any direct evidence that the police and the restaurant workers had agreed to an arrangement to deny her service and arrest her on pretextual charges. Nevertheless, the Supreme Court held that the defendants seeking summary judgment failed to carry their burden by failing to foreclose facts from which a jury could infer such an agreement. Id. at 148.

Thus, a genuine issue of material fact remains, and a jury must decide whether Wright used excessive force against Sheppard by actively participating in the assault against him. The motion for summary judgment on behalf of Defendants City of Blackshear, Etheridge, Carter, and Wright (Dkt. no. 35-1) is **DENIED** solely as to Defendant Wright, and **GRANTED** as to the other Defendants.

## II. Excessive Force Claims Against Boyette

Both Plaintiffs bring excessive force claims under § 1983 against Defendant Boyette.

To state a claim under § 1983, a plaintiff must show that the defendant acted under color of state law. Bingham v. Thomas,

654 F.3d 1171, 1175 (11th Cir. 2011). This "under color of state law" requirement means that private parties will not generally be considered state actors for § 1983 purposes. Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992). However, private parties can be liable under § 1983 "if they act in concert with state officials in violating the plaintiff's constitutional rights." Allaben v. Howanitz, 579 F. App'x 716, 718 (11th Cir. 2014); see also Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) ("to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents."). This "joint action" requirement is alternatively referred to a "joint-engagement" or "conspiracy" theory of § 1983 liability. See Dennis, 449 U.S. at 27-28; Harvey, 949 F.2d at 1133.

The Eleventh Circuit has clarified what it means by "joint-engagement" and "conspiracy." "[M]erely calling upon official state authority" does not amount to joint engagement, which requires the private party to actually "join in the exercise" of state authority. Dye v. Radcliff, 174 F. App'x 480, 483 (11th Cir. 2006). And a private party can be said to have conspired to violate a plaintiff's constitutional rights in violation of § 1983 if he "reached an understanding" with the official to deprive the plaintiff of his rights. Rowe v. City of Ft.

Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2002). Evidence of an understanding need not amount to a "smoking gun," but there must be some evidence of agreement between the defendants, and such an agreement presupposes communication. Id. at 1284; Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990); Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992).

The question, then, is whether a jury could conclude, based on the evidence available, that Boyette "reached an understanding" *either* with Wright, who allegedly held Sheppard still so that Boyette could strike him in the face with a flashlight, or with the officers who arrested Plaintiff Myers in the woods, and who allegedly held Myers while Boyette beat him for two or three minutes. If there is sufficient evidence of such agreements, then Boyette can be held liable for depriving Plaintiffs of the constitutional rights under color of state law via § 1983. If there is not sufficient evidence, then Boyette cannot be liable under § 1983, and Plaintiffs' remedies for the alleged assault can only arise from state-law claims not presently before the Court.

The evidence of any agreement between Boyette and the arresting officers is of the same variety as the evidence of Wright's willing participation in Boyette's assault on Sheppard, discussed above. Helpful, then, is a revisit of Adickes v. S.H.

Kress & Co.. In Adickes, Supreme Court held that the party moving for summary judgment—the restaurant that refused service to Adickes—failed to foreclose with evidence the possibility that an officer was present in the restaurant when the servers refused to take Adickes's order, and that a jury could infer from this possibility that the officer and the servers had somehow come to an agreement to refuse service to Adickes and then arrest her on a trumped up charge. Adickes, 398 U.S. at 157-59. The Supreme Court held that that evidence—the presence of a police officer in the restaurant—was sufficient to preclude summary judgment on a § 1983 conspiracy claim.

Here, there is evidence that could lead a reasonable jury to infer that Boyette conspired to deprive Sheppard and Myers of their constitutional rights. The evidence of Wright's willing participation in Boyette's assault on Sheppard could reasonably suggest that Boyette had reached an understanding with Wright to commit the assault. While a prior agreement "presupposes" communication, Bailey, 956 F.2d at 1122, evidence of such communication need not be a "smoking gun"—all that is necessary is "some evidence" of agreement. Rowe, 279 F.3d at 1284; Bendiburg, 909 F.2d at 469. And here, as in Adickes, there is no direct evidence of any prior communication between Boyette and Wright to deprive Sheppard of his rights. But that conclusion could easily be inferred from the circumstances.

AO 72A
(Rev. 8/82)

And while Myers was unable to identify with 100 percent certainty who attacked him in the woods, he is 75 percent sure it was Boyette based on how he was dressed and the sound of his voice. Myers says he was immediately beaten and choked after he was handcuffed by the search team, and that this beating lasted two to three minutes. He also says his assailant referenced "stealing from us." This evidence suggests that some law enforcement officers—whether Britt and Gourley or some other unidentified officers—arrested Myers and then allowed Boyette to assault him. A jury could infer that a civilian would not have had such an opportunity to abuse a recently captured and handcuffed thief without the help of a law enforcement officer.

Boyette was present at the crime scene when police apprehended Sheppard and Myers. He allegedly attacked both of these men while they were in police custody. If a jury believes Sheppard's and Myers's accounts, it could infer that Boyette assaulted Plaintiffs in willful participation with state actors, and that he violated their constitutional rights under color of state law. Thus, the evidence available is sufficient to preclude summary judgment, and Plaintiff's § 1983 claims against Boyette can proceed to trial. Defendants Boyette and Boyette Electric's motion for summary judgment (Dkt. no. 37-1) is **DENIED** as to Defendant Boyette and **GRANTED** as to Defendant Boyette Electric.

**CONCLUSION**

Because issues of material fact remain as to Defendants Britt, Gourley, Wright, and Boyette's § 1983 liability, summary judgment is **DENIED** solely as to these defendants' motions (Dkt. nos. 35, 37, 39). Summary judgment is **GRANTED** as to Defendants City of Blackshear, Etheridge, Carter, and Boyette Electric.

**SO ORDERED**, this 22ND day of January, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)